ILLINOIS CENT. R. CO. *v.* ROBERSON.

(Division A. Oct. 23, 1939.)

[191 So. 494. No. 33835.]

James McClure, of Sardis, **Burch, Minor & McKay,** of Memphis, Tennessee, and **E. C. Craig** and **V. M. Foster,** both of Chicago, Ill., for appellant.

508

Herbert M. Fant, of Sardis, Herbert Holmes, of Senatobia, and Richard Busby, of Memphis, Tennessee, for appellee.

Argued orally by James McClure, for appellant.

**Anderson, J.**, delivered the opinion of the court.

Appellee brought this action in the circuit court of Panola County against appellant for damages for an injury to his truck on account of being struck by one of appellant's trains at a country crossing, and recovered a judgment in the sum of $530. From that judgment, appellant prosecutes this appeal. The only question in the case is whether appellant was entitled to a directed verdict, which was requested and refused.

The material facts are undisputed. There is left therefore only questions of law.

The declaration was in three counts. At the close of appellee's evidence in chief, appellant moved the court for a directed verdict. The motion was sustained as to counts one and two, but overruled as to count three. Summarizing count three: It charges that the track south and outside of the corporate limits of the town of Batesville enters an abrupt curve to the southeast 250 yards north of a crossing. That the crossing is near the center of the curve. That a person on the west side of a south bound train cannot see an object on the crossing until the instant the crossing is reached, while a person on the east side cannot see an object on the crossing until the locomotive is so near that the train cannot be stopped in time to avoid a collision. That this crossing is dangerous, particularly in the night-time. That the headlight of the locomotive shines directly in front of it, and not on the track or crossing. That the train which struck appellee's truck was going south running in excess of 65 miles an hour. That the curve was deeply banked to accommodate this speed. That due to these and other natural conditions surrounding the crossing it was impossible for those in charge of the train to have stopped it or materially slackened its speed before reaching the crossing after seeing the truck on the crossing. That these conditions were known to appellant. That the

operation of the train as set forth was negligent and proximately contributed to the collision.

The undisputed facts were: The collision occurred about one o'clock at night. The truck was practically new, nevertheless was performing badly. It was barely creeping along as it approached the crossing. Appellee did not stop his truck and look and listen for an approaching train, as required by Section 6124 of the Code of 1930. The crossing was in the country not within the corporate limits of any municipality. The evidence is silent as to whether it was a public or private crossing, and whether it was little or much used. The train was a passenger train going south, consisting of a locomotive tender and sixteen coaches. The enginemen in charge of the train could not and did not see the crossing or the truck upon it until the train had gotten within 250 feet of the crossing. At that time it was running between 55 and 60 miles an hour. As soon as they discovered the truck upon the crossing, they did everything possible with the means at hand to stop the train and were unable to do so. The inability of the enginemen to see the truck until the engine came within 250 feet of the crossing was due to the fact that the crossing is located in a deep curve and at night the rays of the headlight of the engine could not follow the curve, but shone directly ahead of the engine and out across the fields. The crossing was not shown until the engine was about 250 feet therefrom. The statutory signals for the crossing were given. The train is a through passenger train, running from Chicago in the State of Illinois to New Orleans in the State of Louisiana. It carries United States mail, passengers, and express, and has connections with other trunk lines of railroad along its route, and has a schedule that it must maintain in order to make connections at points of interchange with other trunk line carriers. From Memphis in the State of Tennessee to Canton in this State there are one hundred and eight curves. In order for a train to proceed around each of these curves at night,

slowly enough to stop within the distance between the engine and objects on the track becoming visible as the rays of the headlight fall upon them, there would be an average loss of running time of ten minutes for each curve. If such slowing of speed were required the train could not maintain its schedule and continue to render to the public its present passenger, mail, and express service.

St. Louis & S. F. R. Co. v. Moore, 101 Miss. 768, 58 So. 471, 39 L. R. A. (N. S.), 978, Ann. Cas. 1914B, 597; Nixon v. Illinois Cent. R. Co., 103 Miss. 405, 60 So. 566, are not decisive of the question here involved. The injuries sued for occurred within the corporate limits of municipalities. Ordinarily there is no restriction on speed at country crossings. The requirements of modern transportation make it necessary that passenger trains be operated at high speed, and not slowed down ordinarily outside of the limits of municipalities. New Orleans & N. E. R. Co. v. Holsomback, 168 Miss. 493, 151 So. 720; New Orleans & N. E. R. Co. v. Wheat, 172 Miss. 524, 160 So. 607; Hancock v. Illinois Cent. R. Co., 158 Miss. 668, 131 So. 83; Payne v. Hamblin, 126 Miss. 756, 89 So. 620, 23 A. L. R. 146; Flynn v. Kurn, 183 Miss. 413, 184 So. 160; Mobile & O. R. Co. v. Bryant, 159 Miss. 528, 132 So. 539.

The following portion of the opinion in the Holsomback case is especially applicable to this case:

"This court said in Hancock v. Illinois Central Railroad Co., 158 Miss. 668, 131 So. 83, 84, that: 'The very purpose of locomotion by steam upon railways is the accomplishment of a high rate of speed in the movement of passengers and freight, and this the law authorizes. To require railroads generally so to reduce their speed at all grade crossings as to avoid collisions with persons who may, carelessly or accidentally, be upon the crossing when a train is approaching would defeat, to a great extent, the purpose of the existence of railroads.' See, also, Mobile & O. Railroad Co. v. Bryant, 159 Miss. 528, 132 So. 539.

"Appellee's testimony, taken as true, was that the train was running about fifty miles an hour. There was a curve in the railroad which, according to measurements made, was 117 yards north of the crossing, but according to appellee's estimate was 260 yards to the north. The testimony is undisputed that the train, which was more than three hundred yards in length, ran approximately four hundred yards after the brakes were applied, and this, according also to the undisputed testimony, was approximately the shortest distance within which a train of that length and running at that speed could be stopped; the track being downgrade at that point. Since, then, the outlet of the curve where the enginemen could first see the automobile was only 260 yards from the automobile and the train could not be stopped, according to all the testimony in the record, in less than 400 yards, it follows that no actionable negligence can be fastened upon the enginemen for failing to come to a stop or in their attempt so to do before the automobile was hit."

Under the facts of this case and the applicable law, the enginemen in charge of the train involved were without any negligence whatsoever. On the other hand, appellee was guilty of negligence because of his violation of the Stop, Look and Listen statute, Section 6124, Code of 1930, and such negligence may have caused the collision. If he had complied with the statute, he might have seen or heard the approaching train before attempting to make the crossing.

Reversed and judgment here for appellant.